ANNIE ESTELL BOURGEOIS

*v.*

LEWIS MILLER et al.

[Submitted June 25th, 1918.  Decided July 12th, 1918.]

1. A restrictive covenant in a deed against a livery or sales stable does not include a public garage.

2. A public garage is not a nuisance *per se*.  Whether it is a nuisance in fact depends upon the manner in which it is kept and the business conducted.

On final hearing.

*Messrs. Bourgeois & Coulomb,* for the complainant.

*Messrs. Babcock & Champion, Mr. Clarence L. Cole* and *Mr. Robert H. M'cCarter,* for the defendants.

BACKES, V. C.

This bill is to restrain the use of a building, in the course of construction, for a public garage.

The defendants own a lot at the corner of Ocean avenue and Ninth street, in a residential and closely built-up section of Ocean City, and upon it they intend building a one-story public garage, capable of housing from seventy to one hundred automobiles.  It is to be of brick construction, with a slag roof supported by wooden trusses, rafters and sheathing, cement floor and framework windows and doors.  Two five hundred-gallon gasoline tanks are to be sunk under the pavement of Ocean avenue, from which gasoline is to be supplied to automobiles by a pump on the outside of the building.  It is to be lighted with electricity, and as it is to be operated during the warm seasons only no heating appliances are to be installed.  The complainant, Bourgeois, owns the Normandie, a six-story frame hotel, opposite and across Ninth street, sixty-eight feet away, and the complainant Frey owns the Traymore Hotel, a five-story structure in the rear of the proposed garage and twenty feet distant.  Both are summer hotels and open for trade from the late spring to the early fall only.

Upon the filing of the bill and after a hearing the defendants were restrained *pendente lite* from keeping within the building then erected on the lot, and of which the proposed garage is to be an extension, "any gasoline stored therein in barrels, automobile tanks, cans or otherwise," and thereupon further building operations ceased.  At that time there was an element in the case, which perhaps had some influence upon the court, that has since

been eliminated: An ordinance of the municipality prohibited the erection of a public garage in the district in which the complainants' land is located, which was recently repealed by a vote of the people on a referendum under the Walsh act.

One of the grounds upon which the complainants rest their claim to a permanent injunction is that the use of the building for a public garage will violate a restriction contained in all of the deeds of the Ocean City Association, the promoter of the town and the common grantor of all the lands within its boundaries, which provides—

"No building or any part thereof erected upon said lot or lots shall be used or occupied as a *livery or sales stable*, dye house, bone boiling or skin-dressing establishment, soap, candle, glue, starch, lamp black, poudrette or fish guano manufactory, slaughter-house, piggery or tannery, nor shall any building be used or occupied as a drug store without the written consent of the said party of the first part hereto."

The argument is that the terms "livery or sales stable" are the equivalent of, and comprehend, a public garage. It has been observed that a public garage is a modern substitute for the ancient livery stable (*Smith* v. *O'Brien, 94 N. Y. Supp. 673*), and that garages occupy with relation to automobiles the same place that stables do with relation to horses (*Diocese of Trenton* v. *Toman, 74 N. J. Eq. 702*); and the lexicographer says that "a garage is a stable for the storage of automobiles or other horseless vehicles" (*Cent. Dict. 1905–1908*), but the definition manifestly does not meet that of a livery stable—"a stable where horses are kept for hire and where stabling is provided" (*Webster*). The restriction relates solely to the nature of the business and not to the type of the building. An unsightly livery stable may be erected with impunity, and any lawful business, other than those proscribed, may be carried on without danger of infraction. It might even be permissible to put up a stable and rent stalls for horses and storage for wagons. The covenant aimed at the assembling of multitudes of horses and was intended to rid the neighborhood of the annoyances of noise, odors and flies usually centered about a livery stable, and the restriction is only upon the business calculated to bring about that result. Now, it may be that garages are more objectionable in a

residential quarter than livery stables, and so are many other enterprises, as, for instance, a planing-mill, machinery or boiler-shop, street car barn or a railroad station (*Bridegwater* v. *Ocean City, 62 N. J. Eq. 276*), that are not under the ban. Public garages are not specifically interdicted. The inclusion in the covenant of specified objectionable trades excludes all other forms of lawful business. The livery or sales stable may have been the commercial predecessor of the public garage, but the covenant against the one is not therefore to be extended by implication to the other. A public garage is neither within the spirit nor the letter of the covenant. When the covenant was formulated, nearly forty years ago, such a thing as a public garage was unknown; and it would require terrific stretching of the definition of a livery or sales stable to embrace "a place for housing automobiles." It is not, however, required to go to this length in disposing of this phase of the bill, and relief must be denied if it appears that the complainant's right thereto is not clear. That it is, at least, highly questionable whether the forbidden livery or sales stable includes a public garage cannot be denied. Courts of equity do not aid one man to restrict another in the uses to which he may lawfully put his property, unless the right to such aid is clear. *Fortesque* v. *Carroll, 76 N. J. Eq. 583.* In that case, Mr. Justice Garrison, speaking for the court of errors and appeals, said that "it is well settled that in cases where the right of a complainant to relief by the enforcement of a restrictive covenant is doubtful—'to doubt is to deny.'" The reasons for the rule, as pointed out in the opinion, are—*first,* because of restrictions of the lawful uses of property are against common right, and *second,* because restrictions, in the framing of which a subsequent purchaser has had no voice, ought to be so clear that by the acceptance of the deed that declares them he may reasonably be deemed to have understood and acceded to them. *Howland* v. *Andrus, 81 N. J. Eq. 175.*

The other grounds of complaint are that the noises and odors of a public garage will be a nuisance; that asphyxiating fumes from partially burnt gasoline will be dangerous to life, and that gasoline in large quantities in the supply tanks, and in the automobiles to be stored in the garage, will be an ever-present menace

to life and property. These are all purely questions of fact. The burden of proof is upon the complainants and is all the more difficult to sustain because the dangers are merely apprehended. The proofs must establish, clearly and satisfactorily, that the business of a public garage in the immediate vicinity of the complainants' property will be of a character as to necessarily produce the mischief which the court is called upon to prevent.

The nuisance feature of noises and odors was not pressed in the argument.

The danger to life from asphyxiating gases is negligible. In starting machines there sometimes occurs a backfire, due to gross neglect in cleaning, or to an excess of gas, in common parlance called too rich a mixture, which emits a fume, said to be poisonous, causing asphyxiation if inhaled in sufficient quantity. That a fatality may happen under favorable circumstances is possible, but it seldom occurs, and then only in closed quarters where the gas is generated and discharged. Automobiles do not, of course, normally backfire at starting, nor do all start out of a public garage at the same time, but suppose that in the usual course of daily trade the average mishaps in this respect take place, is it at all likely that the fumes would set up the grave danger the complainants apprehend? Experience does not confirm it, nor is it established by the proofs. Employes and others in and about garages suffer no serious inconveniences from the gas, although they come directly in contact with it, and far less is there possibility of harm to those in adjacent properties. Noisome fumes that escape from the building are taken up by the air, neutralized and dissipated, so that there is little ground for alarm or fear that they will penetrate contiguous homes in such volume as to threaten health or life. The distance from the proposed garage to the complainants' hotels—twenty feet from the one and sixty-eight feet from the other—gives ample clearing space and reasonable assurance against the danger causing the anxiety.

It remains to be considered whether the business is to be enjoined because of the danger from explosions. A public garage is not a nuisance *per se,* and the complainants do not contend that it is; they rest their right to relief expressly on the ground that the storing of large quantities of gasoline in tanks and in

19

automobiles in the garage, in close proximity to their hotels, will subject them, their property, and their guests, to an extraordinary hazard, to which they ought not to be obliged to submit. The principles upon which a court of equity acts in such a situation are informingly discussed by Vice-Chancellor Garrison in *O'Hara* v. *Nelson, 71 N. J. Eq. 161, 629,* and were the circumstances the same I would feel bound, authoritatively, by that case. There, upon a bill filed to enjoin a public garage, the keeper was restrained from filling automobiles inside the garage and from storing therein automobiles containing gasoline, on the ground of danger from explosions, in surroundings where the destruction of person and property would not nearly have approximated the damage that would ensue from a similar occurrence here. Whether a catastrophy would involve one or more persons or property of small or great value is, of course, beside the issue. An individual is as much entitled to protection as are communities. The question is whether, with reasonable care, a public garage can be conducted without danger of such a calamity. The learned vice-chancellor, upon the facts before him, ruled that it could not, but the evolution in the automobile field impels me to a different view. The inflammable and explosive properties of gasoline and its vapors, as described and compared with other explosives in the case cited, is borne out by the evidence before me, and need not be dwelt upon further, but an entirely different state of affairs exists to-day in the handling of gasoline as a garage commodity, and in its use as motive power of automobiles, than prevailed in 1906, when the *O'Hara Case* was decided. Such vast improvements have been made in both directions that the dangers at that time apprehended have been reduced to a minimum and the causes for alarm practically removed. The methods then employed are archaic now. Although only twelve years ago, the automobile was still in the formative and experimental stages and as much an object of curiosity as the aeroplane is to-day. Then there were but thirteen thousand in this state; now there are one hundred and thirty-seven thousand, and over seven million in the United States. Then, in a day's trip of fifty miles, the operator often spent more time on his back than he did at the wheel; "chauffeur" was a word of

uncertain pronunciation; kerosene was used in the lamps; the self-starter, demountable rims, electric lights, the racer and the truck, the luxurious limousine and the practical Ford were either not conceived or still in the borning. And with all of these the development of the motor mechanism has kept stride, until it has about reached the point of perfection. Leakage of gasoline is the result of inexcusable carelessness or the purest accident. The accumulation of grease and dirt is due to the sheerest neglect. In these deplorable circumstances, fire may occur from a short circuit of the electric appliance, but only when the insulation is worn off. Gasoline contained in the ordinarily well-constructed and well-kept automobile is comparatively as free from danger of explosion as steam in a boiler. The lurking danger in the one is external; in the other internal. Both can be guarded against by proper attention and reasonable care. To require automobile tanks to be discharged before storing is impracticable and would close down the business. But if, perchance, an automobile should take fire in a garage, followed by an explosion of the tank, the danger would be local, confined to the machine or the immediate surroundings. There is no evidence before me throwing light upon the force of an explosion of a twenty-gallon tank, but my investigation satisfies me that it would not be so great as to do harm beyond the garage itself, and if this be so, and I have learned nothing to the contrary, the complainants are without footing. It is said of gasoline that as an explosive the danger is ten times greater than gunpowder. *Standard Oil Co.* v. *Tierney, 92 Ky. 367.* Yes, in the abstract, but not in the automobile. We recline unconcernedly in touring cars over a tank of gasoline, but it would indeed be a reckless spirit who would ride over a can of gunpowder, smoking. Instances of explosions of automobile tanks while in garages are extremely rare and isolated. The infrequent explosions generally follow violent collisions. Destructive fires from that source are at least as uncommon as formerly were fires in livery stables, and they were not regarded as common law nuisances on that score. The housing of from seventy-five to one hundred machines in a public garage would, admittedly, multiply the risk, but that would call for increased

attention and care, which is not to be assumed would not be forthcoming.

Now, as to the danger from the supply tanks: The prevailing practice of former days of filling automobiles was by decanting from open vessels, the danger from which, more than anything else, influenced the vice-chancellor to grant the injunction in the *O'Hara Case*. This method has been abandoned. The tanks, sunk in the earth, either under the pavement or immediately inside of the door, are charged direct from the supply wagon, and automobiles are filled on the outside of the garage by an automatic measuring pump, through a hose. There is little or no escape of gas during either operation, and the chance of fire coming in contact with the supply tank is remote. This standard method, universally adopted as an economic as well as a safety measure, has long stood the test of reasonable assurance against explosion, and its capacity in that respect is no longer open to speculation.

Granting that gasoline, unconfined, is inherently dangerous, so that the "greatest care is but the slightest assurance of safety," and that its explosive properties by far exceed those of gunpowder, it is not a permissible corollary that public garages are in the category of dangerous agencies to which powder magazines and nitro glycerine and TNT plants belong.

In confirmation of the views I entertain that a public garage is not of, and in, itself a menace to contiguous life and property, and that whether it is a nuisance in fact depends upon the manner in which it is kept and the business conducted, I need only point to the myriad in operation throughout the land, erected in densely populated communities, amid and alongside hotels and hospitals, theatres and public buildings, and without casualty more than usual in ordinary trade and enterprise. Like in other towns, they are numerous in Ocean City, some in the business portion and others in the residential section of the complainants, surrounded by frame structures, private and *quasi*-public, and with due care they have been managed for years without hurtful result to the adjacency. So free from danger is the automobile regarded that it is not an uncommon practice to build a garage in the basement of dwellings. The residence adjoining

CASES IN CHANCERY, 1918. 293

*89 N. J. Eq.*  Seacoast Real Est. Co. *v.* Amer. Timber Co.

the proposed garage is a sample. It may properly be said of public garages, as new institutions in our social and commercial life, as was once upon a time said concerning steam agencies: "They are absolutely necessary to the progress of the community, and each member must suffer the incidental damage and liability to danger which arises from their non-negligent use. They are not nuisances if properly maintained and operated."

There was some evidence to support the complaint that a public garage would increase the complainants' fire insurance premiums and would also depreciate the value of their property. Mere diminution of the value of the property of the party complaining, by the nuisance, without irreparable mischief, will not furnish any foundation for equitable relief. *Zabriskie* v. *Jersey City and Bergen Railroad Co., 13 N. J. Eq. 314;* *Morris and Essex Railroad Co.* v. *Prudden, 20 N. J. Eq. 530.*

The bill will be dismissed, with costs.